**Samuel C. STRETTON Appellant in 91–1439,**

v.

**DISCIPLINARY BOARD OF THE SUPREME COURT OF PENNSYLVANIA; Robert H. Davis, Jr., Pennsylvania Judicial Inquiry and Review Board, Appellants in 91–1398.**

Nos. 91–1398, 91–1439.

United States Court of Appeals, Third Circuit.

Argued Aug. 16, 1991.

Decided Sept. 9, 1991.

Rehearing Denied Oct. 8, 1991.

David M. Donaldson, (argued), Howard M. Holmes, Administrative Office of Pennsylvania Courts, Philadelphia, Pa., for appellees/cross-appellants Disciplinary Bd. of the Supreme Court of Pennsylvania, Robert H. Davis, Jr., and Pennsylvania Judicial Inquiry and Review Bd.

Samuel E. Klein, (argued), Katherine Hatton, Martin J. D'Urso, Kohn, Savett, Klein & Graf, P.C., Philadelphia, Pa., Stefan Presser, Franklin Fink, American Civil Liberties Union of Pennsylvania, Philadelphia, Pa., for appellant/cross-appellee Samuel C. Stretton.

Robert C. Heim, Jerome M. Marcus, Dechert Price & Rhoads, Philadelphia, Pa., for amicus curiae Pennsylvanians for Modern Courts.

Before COWEN, NYGAARD and WEIS, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

The Code of Judicial Conduct in force in Pennsylvania states that candidates for a judicial office in an election may not announce their views on disputed legal or political issues. We predict that the state supreme court would construe the restriction to apply only to issues likely to come before the courts. Read in that fashion, the limitation meets constitutional standards and we, therefore, vacate an injunction entered by the district court striking down that provision of the Code. We will affirm the district court's order sustaining the Code's ban on personal solicitation of campaign funds by a candidate for judicial office. 763 F.Supp. 128.

Plaintiff is a lawyer and candidate for judge of the Court of Common Pleas of Chester County, Pennsylvania in an election scheduled for November 5, 1991. He brought suit in the district court contending that his ability to campaign for the position is impeded by the limitations imposed by the Code of Judicial Conduct. The Code, adopted by the Pennsylvania Supreme Court pursuant to authority granted by the state constitution, is applicable to members of the state judiciary and candidates for judicial office.

The complaint sought an injunction against enforcement of Canon 7 of the Code, which bars judicial candidates from announcing their views on disputed legal or political issues and also prohibits personal solicitation of campaign funds. Named as defendants were the Pennsylvania Judicial Inquiry and Review Board, the Disciplinary Board of the state of Pennsylvania, and its Chief Counsel, Robert H. Davis, Jr.

Both entities were sued because the campaign of a lawyer who is a candidate for judicial office is regulated by the Code of Judicial Conduct. *See* Rule 8.2 of Pennsylvania Rules of Professional Conduct. If the candidate is elected, violations of the Code of Judicial Conduct committed during the campaign come within the jurisdiction of the Judicial Inquiry and Review Board. If the candidate is not elected, the Disciplinary Board would consider infractions occurring during the campaign.

Plaintiff alleged that he wished to protest the fact that currently in the county the Common Pleas judges are all Republicans, a departure from the bipartisan tradition that prevailed until the late 1950's. In addition, he desired to "announce his views" on the following issues:

(a) the need for the election of judges with an "activist" view, and the obligation of judges at every level of the judicial system to look at societal changes when ruling on challenges to existing law;

(b) criminal sentencing and the rights of victims of crime;

(c) "reasonable doubt" and how he would apply that standard as an elected judge;

(d) the need to more closely scrutinize the work of district justices (formerly known as justices of the peace), particularly in light of the removal of several such justices in recent years because of improper conduct;

(e) the need for various changes in judicial administration including the jury selection process (so that panels more accurately reflect the county's racial composition);

(f) the need for greater sensitivity toward hiring minority lawyers and law clerks, especially by the county's judges and district attorney;

(g) plaintiff's qualifications and those of his opponents as well as a perceived need for a woman judge; and

(h) the importance of the right to privacy as a basic constitutional right.

The requests for a preliminary and permanent injunction were consolidated for a hearing. Plaintiff testified that he believed the topics he listed could be considered "disputed legal or political issues," and he feared discussing them because to do so might violate the Code of Judicial Conduct. Defendant Davis, Chief Counsel for the Disciplinary Board, and Robert Keuch, Executive Director and General Counsel of the Judicial Inquiry and Review Board, testified that as they interpreted the Canon, discussion on the topics plaintiff listed would not violate the Code. Both also said that they could not bind the current Boards or their successors by their opinions.

Plaintiff also testified that he desired to send a form letter over his signature soliciting funds for his campaign. Based on experience in other non-judicial political campaigns, he believed that absent a personal appeal, the amount that could be raised would be substantially less. Defendants pointed out that plaintiff was free to appoint a campaign committee to raise funds, but that personal requests for money, particularly from lawyers, would violate the Code.

The district court determined that because a narrow construction of the Code was unlikely, abstention was not appropriate. Acknowledging that the state had a

compelling interest in preserving the integrity of its electoral process, the court nevertheless found Canon 7's limitation on speech to be "drastically overbroad. Just as a state may not prohibit a candidate from making *any* promises to voters . . . it may not prohibit judicial candidates from announcing any of their views at any time in any setting on disputed legal or political issues."

The court noted that within the previous year the American Bar Association adopted a new Model Code that modified the text of the existing Canon because it contained an overly broad limitation on speech. Rejecting defendants' proffered narrow construction, the district judge concluded that he could not rewrite the Code and that its restrictions violated the First Amendment.

In contrast, the court upheld the Code's provision prohibiting personal solicitation of funds by judicial candidates. In that instance, the Canon "is narrowly tailored to achieve the compelling state interests of preventing the reality and the appearance of political corruption as well as the additional compelling interest of assuring an impartial judiciary."

On appeal plaintiff renews his contention that Canon 7's restriction on speech is overbroad. He points out that the Disciplinary Board began an investigation of statements made by another lawyer in a judicial campaign. Plaintiff also maintains that the ban on solicitation of funds does not serve a compelling state interest and that less restrictive means to accomplish the desired end are available.

Defendants urge a narrow construction "to limit Canon 7's prohibition to speech that exhibits partiality toward possible future adjudications." (Appellee Brief at 38). They maintain that such a construction passes constitutional scrutiny. Defendants also contend that strict adherence to the prohibition against a candidate's personal requests for campaign funds is necessary to prevent the appearance of fraud or coercion.

## I.

Preliminarily we note that the case is not moot. The Boards take the position here as they did in the district court that the topics plaintiff proposes to discuss in the course of his campaign do not violate the Code. The Boards, however, do not have the final word on interpretation of the Code. Moreover, plaintiff has also challenged the Canon on overbreadth grounds and may maintain the action on that basis. *See Board of Trustees of the State Univ. of New York v. Fox,* 492 U.S. 469, 484, 109 S.Ct. 3028, 3037, 106 L.Ed.2d 388 (1989).

## II.

■ The meaning and construction of the Code are matters of state law to be decided ultimately by the state Supreme Court. The divergent readings by the parties make it rather obvious that an authoritative ruling by that court would resolve or substantially narrow the area of conflict. In many respects, the case is analogous to *Hughes v. Lipscher,* 906 F.2d 961 (3d Cir. 1990). There we directed *Pullman* abstention where the resolution of an unsettled question of state law could moot or change the analysis of the federal constitutional issue. In that case, as here, were present three requisite special circumstances:

1. Uncertain issues of state law underlying the federal constitutional claims brought in the district court;

2. Amenability of the state law issues to a state court interpretation that would obviate the need for, or substantially narrow, adjudication of the federal claims;

3. Disruption of important state policies through a federal court's erroneous construction of state law.

■ When these special circumstances exist a court must then consider whether abstention is appropriate by weighing such factors as the availability of an adequate state remedy, the length of time the litigation has been pending, and the potential impact on the parties caused by delay in obtaining a state ruling. It is the last listed of these considerations that persuades us that we should not abstain here.

■ The election is but a few weeks away and it is highly unlikely that a timely ruling could be obtained from the state court. If the matter remains in limbo, not only the plaintiff, but other judicial candidates in Pennsylvania, will be left in doubt over the permissible areas of campaign discussion open to them.

In the absence of a ruling now, some judicial candidates may be unwilling to risk disciplinary action and, instead, choose to impose unnecessarily rigid self-censorship on matters that are legitimate subjects for discussion and appraisal by the electorate. That development would constitute a harm to the public that could not be remedied by a subsequent court decree. In that respect, this case is unlike *Hughes* where no real harm resulted from delay. *Cf. Frederick L. v. Thomas*, 557 F.2d 373 (3d Cir. 1977); *Moe v. Dinkins*, 635 F.2d 1045 (2d Cir.1980). Consequently, we will proceed to the merits.

## III.

Canon 7 provides:

"B. Campaign Conduct.

(1) A candidate ... for a judicial office ...

(c) should not make pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office; announce his views on disputed legal or political issues; or misrepresent his identity, qualifications, present position, or other fact." Pennsylvania Code of Judicial conduct (1974).

■ Speech uttered as part of a campaign for public office directly and unmistakably invokes the protection of the First Amendment. *Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 223, 109 S.Ct. 1013, 1020, 103 L.Ed.2d 271 (1989). Nevertheless, freedom of political discussion is not absolute.

The Supreme Court was confronted with a restriction on political speech in *United States Civil Service Comm'n v. National Ass'n of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). There the plaintiff sought to prevent implementation of the Hatch Act's ban on campaigning by federal employees. The Court held that the right to participate in political activities was not absolute. "Nor are the management, financing, and conduct of political campaigns wholly free from governmental regulation." *Id.* at 567, 93 S.Ct. at 2891.

The Court commented that "the government has an interest in regulating the conduct and the 'speech of its employees that differs significantly from those it possesses in connection with regulation of the speech of the citizenry in general.'" *Id.* at 564, 93 S.Ct. at 2890. Moreover, not only is it important that governmental employees "in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it." *Id.* at 565, 93 S.Ct. at 2890.

As the Court summed up—the goal is, in any case, to arrive at a balance between the interests of the individual to comment on matters of public interest and the governmental interest. *Id.* at 564, 93 S.Ct. at 2890; *see also Gentile v. State Bar of Nevada*, —— U.S. ——, 111 S.Ct. 2720, 2745, 115 L.Ed.2d 888 (1991) ("When a state regulation implicates First Amendment rights, the Court must balance those interests against the State's legitimate interest in regulating the activity in question."); *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968).

■ Because of the significant concerns implicated in restricting political speech, achieving a balance requires the state to establish a compelling interest and the restrictions to be narrowly tailored to serve that interest.[1] "[T]he First Amendment surely requires that the restriction be demonstrably supported by not only a legitimate state interest, but a compelling one, and that the restriction operates without

---

1. Defendants assert that *Gentile* requires the application of a less stringent standard in this case. That case dealt with statements made by an attorney to the press about his client's case prior to trial. We need not decide whether *Gentile* supports defendants' assertion because we conclude that the Canon meets the compelling interest standard.

unnecessarily circumscribing protected expression." *Brown v. Hartlage*, 456 U.S. 45, 53, 102 S.Ct. 1523, 1529, 71 L.Ed.2d 732 (1982); *see also First Nat'l Bank v. Bellotti*, 435 U.S. 765, 786, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707 (1978). There are thus two facets to the analysis when a First Amendment infringement is alleged—the compelling state interest and the breadth or scope of the restriction.

■ Accordingly, it becomes necessary to define the state's interest in regulating the comments of judicial candidates. Although a state has a deep concern in preserving the integrity of its election process, *Eu*, 489 U.S. at 231, 109 S.Ct. at 1024, its right to restrict the speech of its candidates for legislative and executive offices does not extend so far as to " 'select which issues are worth discussing or debating' ... in the course of a political campaign." *Brown*, 456 U.S. at 60, 102 S.Ct. at 1532.

There can be no question, however, that a state has a compelling interest in the integrity of its judiciary. In *Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), the Court upheld a state statute barring picketing near a courthouse, pointing out that "[a] State may also properly protect the judicial process from being misjudged in the minds of the public." *Id.* at 565, 85 S.Ct. at 481. In another case, Justice Stewart said, "There could hardly be a higher governmental interest than a State's interest in the quality of its judiciary." *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 848, 98 S.Ct. 1535, 1546, 56 L.Ed.2d 1 (1978) (Stewart, J., concurring).

*Morial v. Judiciary Comm'n*, 565 F.2d 295 (5th Cir.1977), *cert. denied*, 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978), presented the question of whether the state's requirement that a judge resign before campaigning for a non-judicial office was constitutional. The Court of Appeals upheld the provision noting that "[t]he state's interest in ensuring that judges be and appear to be neither antagonistic nor beholden to any interest, party, or person is entitled to the greatest respect." *Id.* at 302.

It requires no extended discussion to demonstrate that Pennsylvania's canon serves this interest. If judicial candidates during a campaign prejudge cases that later come before them, the concept of impartial justice becomes a mockery. The ideal of an adjudication reached after a fair hearing, giving due consideration to the arguments and evidence produced by all parties no longer would apply and the confidence of the public in the rule of law would be undermined.

The functioning of the judicial system differs markedly from those of the executive and legislative. In those areas, the public has the right to know the details of the programs that candidates propose to enact into law and administer. Pledges to follow certain paths are not only expected, but are desirable so that voters may make a choice between proposed agendas that affect the public. By contrast, the judicial system is based on the concept of individualized decisions on challenged conduct and interpretations of law enacted by the other branches of government.

We conclude that Pennsylvania has established a compelling interest and that the Code's restriction serves that end. The fact that a state chooses to select its judges by popular election, while perhaps a decision of questionable wisdom, does not signify the abandonment of the ideal of an impartial judiciary carrying out its duties fairly and thoroughly. The state, however, must also demonstrate that its restriction is narrowly tailored and does not unnecessarily circumscribe protected speech.

During their testimony in this case, the Chief Counsel of the Disciplinary Board and the General Counsel of the Judicial Inquiry and Review Board expressed their opinions that the plaintiff's proposed campaign topics did not violate Canon 7(B)(1)(c). They interpreted the restriction narrowly as prohibiting a candidate only from announcing a position on an issue that may come before the court for resolution. In their view, prejudging an issue is the evil that the Canon is designed to avoid. The witnesses, however, conceded that

their opinions did not bind the Boards or their successors.

The plaintiff, by contrast, would have us read Canon 7(B)(1)(c) in a broad and literal sense and then strike it down *in toto* as overbroad. Parenthetically, although not unknown, it is a somewhat curious situation when the agency charged with enforcement argues for less authority and its opponent would foist unwanted power on the government.

Attacking the Boards' assertion that a narrow construction is appropriate, plaintiff points out that in investigating another judicial candidate, the Office of Disciplinary Counsel initially voiced concern over his remarks questioning the conduct of two state supreme court justices. Whatever might be made of the tone of the initial inquiry into that candidate's statements has been dispelled by the Office of Disciplinary Counsel's action in terminating that proceeding and reiterating the narrow construction of the Canon urged here. We are not convinced that this incident requires us to disregard the Boards' position articulated here and in the district court.

The respective Boards are defendants in this litigation and evidence was presented on their behalf by their Counsel. Defendants argued for a restrictive reading of Canon 7 in the district court as well as on appeal to this court. Having adopted the position in litigation that the Canon is to be interpreted narrowly, the Boards are barred from returning to court and adopting a contrary position. *See Delgrosso v. Spang and Co.*, 903 F.2d 234, 241 (3d Cir. 1990); *Murray v. Silberstein*, 882 F.2d 61, 66 (3d Cir.1989); *O'Neida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419 (3d Cir.1988); *Associated Hospital Service v. Pustilnik*, 497 Pa. 221, 439 A.2d 1149, 1151 (1981). The Boards are thus bound by the argument that Canon 7's use of "announce views" is limited to situations in which the candidate's speech pertains to matters that may come before the court for resolution.

To some extent, therefore, the administrative agencies charged with enforcement of the Canon have taken a position that is entitled to consideration by us. Their interpretation, however, is entitled to less deference than would be appropriate if formal rulemaking had authoritatively expressed the agencies' stance. *See Chevron U.S.A. v. National Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

In Pennsylvania the definitive construction of the Canon is that put upon it by the state Supreme Court, but we would be naive not to recognize that the Judicial Inquiry Review Board's position is, at the very least, a straw in the wind indicating the direction that court will go. The role of Counsel to the Judicial Inquiry Board is somewhat broader than simply advisory. The General Counsel decides whether to begin an investigation into suspected violations and whether to recommend sanctions to the Board. The state Supreme Court acts only upon recommendation from the Board, although it is free to disagree. Pennsylvania Constitution Art. V, § 18(g)(h); *Matter of Cunningham*, 517 Pa. 417, 538 A.2d 473, *appeal dismissed*, 488 U.S. 805, 109 S.Ct. 36, 102 L.Ed.2d 16 (1988).

Giving a narrow construction to "announce views" in Canon 7 is consistent with other provisions of the Code. For example, Canon 4 permits judges to write and speak about the law, the legal system and the administration of justice so long as the judge does not cast doubt on his capacity to decide any issue that may come before him.

Adopting a restrictive interpretation is reasonable in light of the state's interests. They would not be served by "announcements" that would exhibit partiality toward questions raised in future cases and would tend, or appear to, foreclose an open mind in resolving litigation in those areas.

Plaintiff relies on the decisions of the Supreme Court of Kentucky (Special Justices Sitting) in *J.C.J.D. v. R.J.C.R.*, 803 S.W.2d 953 (Ky.1991) and *American Civil Liberties Union, Inc. v. The Florida Bar*, 744 F.Supp. 1094 (N.D.Fla.1990), where, despite finding a compelling state interest, the courts struck down application of Canon 7(B) to campaign speech. In neither

case, however, did the courts consider a narrow construction of the Canon. We, therefore, find those opinions unpersuasive and believe the Supreme Court of Pennsylvania would also find them unconvincing. *Cf. Berger v. Supreme Court of Ohio,* 598 F.Supp. 69, 75 (S.D.Ohio 1984) (although Canon 7 is necessary to prevent misleading or fallacious statements or political pledges, criticism of court administration is not barred).

■ When a statute or regulation is challenged, it should be interpreted to avoid constitutional difficulties. "[T]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988), (quoting *Hooper v. California,* 155 U.S. 648, 657, 15 S.Ct. 207, 211, 39 L.Ed. 297 (1895)); *Frisby v. Schultz,* 487 U.S. 474, 483, 108 S.Ct. 2495, 2501, 101 L.Ed.2d 420 (1988). In fact, courts routinely narrow statutes to avoid a potentially overbroad reach. *Osborne v. Ohio,* 495 U.S. 103, 110 S.Ct. 1691, 1698, 1701–02, 109 L.Ed.2d 98 (1990).

■ We are aware that the state Supreme Court has in the past interpreted its rules in the light necessary to obviate constitutional objections. *See Laudenberger v. Port Authority,* 496 Pa. 52, 436 A.2d 147 (1981) (prejudgment interest rule is procedural, not substantive), *appeal dismissed,* 456 U.S. 940, 102 S.Ct. 2002, 72 L.Ed.2d 462 (1982). Taking into account this practice, the position of the Judicial Inquiry Board, the compelling state interest and the constitutional difficulties, we are persuaded that the broad interpretation of Canon 7 urged upon us by plaintiff would be rejected by the state Supreme Court and that it would adopt the construction advanced by the Boards here. This reading of Canon 7 does not violate the First Amendment because the limitation does not unnecessarily curtail protected speech, but does serve a compelling state interest.

The public has the right to expect that a court will make an assessment of the facts based on the evidence submitted in each case, and that the law will be applied regardless of the personal views of the judge. Taking a position in advance of litigation would inhibit the judge's ability to consider the matter impartially. Even if he or she should reach the correct result in a given case, the campaign announcement would leave the impression that, in fact, if not in actuality, the case was prejudged rather than adjudicated through a proper application of the law to facts impartially determined. *See Cox,* 379 U.S. at 565, 85 S.Ct. at 481 (State may protect against public perception that a judge's action was in part the result of improper influence).

Pursuant to our plenary standard of review and contrary to the view of the district court, we predict that the Supreme Court of Pennsylvania would read Canon 7(B)(1)(c) to mean that "disputed legal or political issues" refers to only those issues that are likely to come before the court. Read in this way the restriction is narrowly tailored to serve the state's compelling interest in an impartial judiciary. Consequently, the plaintiff's challenges to Canon 7(B)(1)(c), both facially and as applied, must fail. *See Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). Accordingly, we will vacate the injunction entered by the district court.

## IV.

■ Canon 7 also prohibits personal solicitation of campaign funds by a candidate for judicial office.

We recognize that as a practical matter, so long as a state chooses to select its judges by popular election, it must condone to some extent the collection and expenditure of money for campaigns. Unquestionably, that practice invites abuses that are inconsistent with the ideals of an impartial and incorruptible judiciary. *See* E. Thode, *Reporters Notes to Code of Judicial Conduct* 98 (1973) ("[t]he problem of funding a campaign for judicial office probably presents the greatest of all conflicts be-

tween political necessity and judicial impartiality").

It is no secret that aside from family and close personal friends of the candidate (rarely affluent, or necessarily enthusiastic sources) judicial campaigns must focus their solicitations for funds on members of the bar. This leads to the unseemly situation in which judges preside over cases in which the parties are represented by counsel who have contributed in varying amounts to the judicial campaigns.[2]

Taking a pragmatic view, the Canons permit a candidate to organize a committee which solicits funds for the campaign. The candidate may submit names of potential contributors to the committee; may review the lists of those who have contributed and the amounts; may send personal thank-you notes to contributors; appear at parties to show appreciation to them; and must sign detailed public reports of contributions filed with state authorities certifying that the campaign committee has not violated any state reporting laws.

Canon 7(B)(2), nevertheless, provides that a candidate "should not himself solicit or accept campaign funds." Plaintiff here disclaims any desire to personally accept funds, but wishes to send a letter over his signature soliciting money and, perhaps also to solicit contributions in person. He argues, not unreasonably, that since candidates are permitted to participate indirectly in the solicitation of funds, and they inevitably learn who did, or did not, contribute, it is but a tiny and credible step to allow direct personal participation.

The district court recognized that campaign financing comes within the scope of the First Amendment citing *Federal Elections Comm'n v. National Conservative Political Action Comm.*, 470 U.S. 480, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985). The court, however, concluded that because Canon 7(B)(2) was not a restriction on what could be expended for promulgating political views, the narrow restriction on the candidates personal conduct was constitutional. *See also Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (Court held limitations on contributions were permissible but limits on individual expenditures were unconstitutional). The district court found compelling state interests in preventing the reality and appearance of political corruption as well as in the necessity of assuring an impartial judiciary.

In an opinion sustaining the constitutionality of a canon with a similar text, the Supreme Court of Oregon said, "The stake of the public in a judiciary that is both honest in fact and honest in appearance is profound.... A judge's direct request for campaign contributions offers a *quid pro quo* or, at least, can be perceived by the public to do so. Insulating the judge from such direct solicitation eliminates the appearance (at least) of impropriety and, to that extent, preserves the judiciary's reputation for integrity." *In Re: Fadely*, 310 Or. 548, 802 P.2d 31, 40 (1990).

There is no aspect of the electoral system of choosing judges that has drawn more vehement and justifiable criticism than the raising of campaign funds, particularly from lawyers and litigants likely to appear before the court.[3] Plaintiff is correct that

---

2. "Representatives of Texaco made campaign contributions totaling $72,700 to seven justices [of the Supreme Court of Texas] while the appeal in the $11 billion Pennzoil lawsuit against Texaco was pending before the court. Not to be outdone, Pennzoil lawyers countered with campaign contributions of more than $315,000." Alfini & Brooks, *Ethical Constraints on Judicial Election Campaigns: A Review and Critique of Canon 7*, 77 Ky.L.J. 671 (1988–89).

3. Distinguished state appellate judges have been quite critical of the necessity for raising funds for judicial campaigns. *See* Krivosha, *Acquiring Judges by the Merit Selection Method: The Case for Adopting Such a Method*, 40 S.W.L.J. 15

(Special Issue, May 1986); Spaeth, *Reflections on a Judicial Campaign: Should Judges Ride a Political Bandwagon?*, 60 Judicature 10 (1976); Utter, *Selection and Retention — A Judge's Perspective*, 48 Wash.L.Rev. 839 (1973). Commentary from other sources is not wanting—a partial listing would include the following: 1 Alfini and Brooks, *Ethical Constraints on Judicial Election Campaigns: A Review and Critique of Canon 7*, 77 Kentucky L.J. 671 (1988–89); Schotland, *Elective Judges Campaign Financing: Are State Judges Robes the Emperor's Clothes of American Democracy?* 2 J.L. & Pol. 57 (1985); Note, *Disqualifying Elected Judges from Cases Involving Campaign Contributors*, 40 Stan.

the currently approved practices do involve the candidate deeply, albeit indirectly, in the process. Nevertheless, we cannot say that the state may not draw a line at the point where the coercive effect, or its appearance, is at its most intense—personal solicitation by the candidate.

The plaintiff's contention that this is the most effective means for raising money only underscores the fact that solicitation in person does have an effect—one that lends itself to the appearance of coercion or expectation of impermissible favoritism. There is no doubt that the methods approved by the Code, together with the state requirements of public disclosure of contributions, do allow such inferences presently. Canon 7, however, cannot be faulted because it does not go far enough. A state is permitted to take steps, albeit tiny ones, that only partially solve a problem without totally eradicating it. *Williamson v. Lee Optical, Inc.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955) ("reform may take one step at a time"); *see also Morial*, 565 F.2d at 302–03 n. 6 (state does not have to exercise full extent of its authority).

A compelling state interest is present and the means currently employed are narrowly tailored to further it. In addition, there are alternative, less objectionable means for raising campaign funds. Accordingly, we agree with the district court's determination that Canon 7(B)(2) does not offend the Constitution.

The decree of the district court denying enforcement of Canon 7(B)(1)(c) will be vacated. The order denying an injunction barring enforcement of Canon 7(B)(2) will be affirmed.

All parties to bear their own costs.

L.Rev. 449 (1988); Note, *Safeguarding the Litigant's Constitutional Right to a Fair and Impartial Forum: A Due Process Approach to Improprieties Arising from Judicial Campaign Contributions from Lawyers*, 86 Mich.L.Rev. 382 (1987);

An interesting comment on the process was made by a Florida judge in *Breakstone v. Mac-*

*Kenzie*, 561 So.2d 1164, 1176 (Fla.Dist.Ct.App. 1989) (Nesbitt, J., dissenting), "Because it is the people's desire that trial judges submit to contested elections, I do not find that the people have a reasonable expectation that they can be free of all of the necessary evils that attend such an election."