**REPUBLICAN PARTY OF MINNESOTA, an association; Indian Asian American Republicans of Minnesota, an association; Republican Seniors, an association; Young Republican League of Minnesota, a Minnesota nonprofit corporation; Minnesota College Republicans, an association; Gregory F. Wersal, individually; Cheryl L. Wersal, individually; Mark E. Wersal, individually; Corwin C. Hulbert, individually; Campaign for Justice, an association; Minnesota African American Republican Council, an association; Muslim Republicans, an association; Michael Maxim, individually; and Kevin J. Kolosky, individually, Plaintiffs,**

v.

**Verna KELLY, in her capacity as Chairperson of the Minnesota Board of Judicial Standards, or her successor, Charles E. Lundberg, in his capacity as Chair of the Minnesota Lawyers Professional Responsibility Board, or his successor; and Edward J. Cleary, in his capacity as Director of the Minnesota Office of Lawyers Professional Responsibility, or his successor, Defendants.**

**No. 98–831 MJD.**

United States District Court,
D. Minnesota.

Sept. 13, 1999.

Tony P. Trimble, Erick G. Kaardal, Trimble & Associates, Ltd., Minnetonka, MN, for and on behalf of Plaintiffs Republican Party of Minnesota, Minnesota African American Republican Council, Indian Asian American Republicans of Minnesota, Muslim Republicans, Republican Seniors of Minnesota, Young Republican League of Minnesota, Minnesota College Republicans, Cheryl L. Wersal, Mark E. Wersal and Corwin C. Hulbert.

Daniel G. Currell, Winthrop & Weinstine, P.A., St. Paul, MN, for and on behalf of Plaintiff Michael Maxim.

William F. Mohrman, Mohrman & Co., P.A., Colorado Springs, CO, for and on behalf of Plaintiff Gregory F. Wersal, Campaign for Justice and Kevin Kolosky.

Mark B. Levinger, Assistant Minnesota Attorney General for and on behalf of Defendant The Honorable Charles Flinn Jr., Chair of the Minnesota Board of Judicial Standards.

Thomas C. Vasaly, Assistant Minnesota Attorney General for and on behalf of Defendants Charles Lundberg, Chair of

the Minnesota Lawyers Professional Responsibility Board and Edward Cleary, Director of the Minnesota Office of Lawyers Professional Responsibility Board.

Steven B. Young, Minnesota Civil Liberties Union as Amicus Curiae urging the Court to grant Plaintiffs' motions for summary judgment.

## AMENDED MEMORANDUM OPINION AND ORDER

DAVIS, District Judge.

In this action, Plaintiffs seek declaratory and injunctive relief, enjoining the Minnesota Lawyers Professional Responsibility Board ("Lawyers Board"), the Minnesota Office of Lawyers Responsibility ("Office of Professional Responsibility") and the Minnesota Board of Judicial Standards ("Judicial Board") from enforcing sections of Canon 5 of the Code of Judicial Conduct (the "Judicial Codes"), which prohibits judicial candidates from engaging in certain conduct during judicial campaigns, on the basis that such prohibitions unconstitutionally infringe upon their rights of free speech, free association and equal protection guaranteed under the United States and Minnesota Constitutions. Plaintiffs also seek an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### Background

1. The Parties

Plaintiff Gregory F. Wersal ("Wersal") is an attorney licensed to practice law within the state of Minnesota. Complaint ¶ 6. In 1996 and 1998, he was a judicial candidate for the position of Associate Justice of the Minnesota Supreme Court. *Id.* Wersal's campaign committee, Campaign for Justice, his wife, Cheryl L. Wersal, and brother, Mark Wersal are also named plaintiffs. *Id.* ¶¶ 7, 8 and 10. Plaintiff Corwin C. Hulbert is an unsolicited advocate of Wersal and his endorsement by the Republican Party and its Affiliated Associations. *Id.* ¶ 9. Finally, the Republican

Party of Minnesota, together with its Affiliated Associations and their respective members, including Michael Maxim, are named plaintiffs (hereinafter referred to as the "Third Party Plaintiffs"). *Id.* ¶¶ 4 and 5.

The named defendants in this case are the Chair of the Lawyers Board, the Director of the Office of Professional Responsibility and the Chair of the Judicial Board. The Lawyers Board has general supervisory authority over the administration of the Office of Professional Responsibility and the Rules of Professional Responsibility and may issue opinions on questions of professional conduct. Rules on Lawyers Professional Responsibility, 4(c). The Director of the Office of Professional Responsibility and his office are the staff component of the Lawyers Board, whose function is to investigate and prosecute complaints against lawyers. Rules on Lawyers Professional Responsibility 6(a) and 8(a). Following an investigation, the Director determines whether or not discipline is warranted, and the type of discipline that is warranted. *Id.* Rules 8(d), 9(a) and 12(a). The Judicial Board has jurisdiction to receive complaints, investigate, conduct hearings and make recommendations to the Minnesota Supreme Court concerning judges alleged to have violated the Codes of Judicial Conduct. Rules of Board on Judicial Standards, 2(a).

2. The Judicial Codes

Judicial codes regulating the conduct of judicial candidates in judicial elections have been existence in Minnesota since at least 1950. Defendants' Lungberg and Cleary, Exs. 19 and 20. In the earlier version of the Judicial Codes, the Canons of Judicial Ethics, judicial candidates were instructed not to engage in making political speeches or from soliciting contributions or endorsements from political parties, because "it is inevitable that suspicion of being warped by political bias will attach to a judge who becomes an active promoter of the interests of one political

party as against another." *Id.,* Canon 28, Ex. 20, p. 53. A judicial candidate was also instructed not to "announce in advance his conclusions of law on disputed issues". *Id.,* Canon 30, p. 54.

The Judicial Codes did become more specific over time. For example, the Codes of Judicial Conduct adopted in 1974 prohibited judicial candidates from the following: making speeches for a political organization, Canon 7(A)(1)(b) (1993), soliciting funds or making contributions to political organizations, or attending political gatherings, Canon 7(A)(1)(c), or engage in any other political activity except on behalf of measures to improve the law, the legal system, judicial administration or the administration of justice. Canon 7(A)(4). This set of Canons did allow a judicial candidate to "attend and speak on his or her own behalf at other than partisan political gatherings during the year in which the judge is a candidate for election or reelection." Canon 7(A)(2). Judicial candidates were also directed to maintain the dignity appropriate to judicial office and should encourage family, and employees or public officials subject to the candidate's control from doing what the candidate could not do. Canon 7(B)(1)(a) and (b) (1993). Also, judicial candidates were directed not to make pledges or to "announce his or her views on disputed legal or political issues". Canon 7(B)(c) (1993).

In 1995, the Judicial Codes addressing the regulation of judicial candidates were amended and are now addressed in Canon 5. Canon 5 was again amended on December 23, 1997, by adding language to clarify ambiguities that resulted from the 1995 amendments.[1] The Sections of Canon 5 relevant to this case, in its present form, are provided below, with the December 1997 amendments underscored:

A. In General.

*Each justice of the supreme court and each court of appeals and district court*

*judge is deemed to hold a separate non-partisan office. MS 2048.06, Subd. 6.*

(1) Except as authorized in Section 5B(1), a judge or a candidate for election to judicial office shall not:

(a) act as a leader or hold any office in a political organization; *identify themselves as members of a political organization; except as necessary to vote in an election;*

(b) publicly endorse or, except for the judge or candidate's opponent, publicly oppose another candidate for public office;

(c) make speeches on behalf of a political organization;

(d) attend political gatherings; *or seek, accept or use endorsements from a political organization;* or

(e) solicit funds for or pay an assessment to or make a contribution to a political organization or candidate, or purchase tickets for political party dinners or other functions.

\*    \*    \*    \*    \*    \*

(3) A candidate for a judicial office, including an incumbent judge:

(a) shall maintain the dignity appropriate to judicial office and act in a manner consistent with the integrity and independence of the judiciary, and shall encourage family members to adhere to the same standards of political conduct in support of the candidate as apply to the candidate;

(b) shall prohibit employees who serve at the pleasure of the candidate, and shall discourage other employees and officials subject to the candidate's direction and control from doing on the candidate's behalf what the candidate is prohibited from doing under the Sections of this Canon;

(c) except as otherwise permitted by Section 5B(2), shall not authorize or

---

1. For example, the 1995 Judicial Codes prohibited a judicial candidate from attending political gatherings in Canon 5 A(1)(d), while

Canon 5 B(1) allowed the judicial candidate to speak to gatherings on his/her own behalf. Ex. J to Wersal Aff.

knowingly permit any other person to do for the candidate what the candidate is prohibited from doing under the Sections of this Canon;

(d) shall not:

(1) make pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office; announce his or her views on disputed legal or political issues; or misrepresent his or her identity, qualifications, present position or other fact, or those of the opponent;

\* \* \* \* \* \*

B. (1) A judge or a candidate for election to judicial office may, except as prohibited by law,

(a) speak to gatherings, *other than political organization gatherings,* on his or her own behalf;

\* \* \* \* \* \*

(2) A candidate shall not personally solicit or accept campaign contributions or solicit publicly stated support. A candidate may, however, establish committees to conduct campaigns for the candidate through media advertisements, brochures, mailings, candidate forums and other means not prohibited by law. Such committees may solicit and accept campaign contributions, manage the expenditure of funds for the candidate's campaign and obtain public statements of support for his or her candidacy. Such committees are not prohibited from soliciting and accepting campaign contributions and public support from lawyers, *but shall not seek, accept or use political organization endorsements.* Such committees shall not disclose to the candidate the identity of campaign contributors *nor shall the committee disclose to the candidate the identity of those who were solicited for contribution or stated public support and refused such solicitation.* A candidate shall not use or permit the use of campaign con-

tributions for the private benefits of the candidate or others.

\* \* \* \* \* \*

*D. Political Organization. For purposes of Canon 5 the term political organization denotes a political party organization.*

\* \* \* \* \* \*

3. Background

Plaintiffs state that during Wersal's 1996 campaign, the Campaign for Justice, as well as Wersal's wife, brother and members of the Republican Party or an Affiliated Association, engaged or participated in one or more of the following types of speech or association on Wersal's behalf: attended gatherings of the Republican party and its affiliated associations and distributed campaign literature and spoke at such gatherings; announced that Wersal was in favor of a strict construction of the Constitution and was critical of certain decisions of the Minnesota Supreme Court; identified Wersal as a member of the Republican party; sought the Republican party's endorsement for Wersal; and solicited campaign contributions. *Id.* ¶¶ 14, 15 and 46. As a result of such conduct, an individual filed a complaint with the Office of Professional Responsibility against Wersal, alleging violations of Canon 5 of the Judicial Codes. Complaint ¶ 15, Ex. C to Wersal Affidavit. The complainant was concerned with Wersal's attendance and speech at the Republican Congressional District Convention and of his seeking partisan support for his campaign. The complainant also noted concern that Wersal was addressing issues which may come before the court to which he sought election. *Id.*

The complaint was investigated and dismissed for three reasons. First, as to Wersal's attendance at a political gathering, the Director of the Office of Professional Responsibility determined that the Canons in force at that time were ambiguous, as one Canon prohibited attendance at political gatherings while another allowed

speech at a "gathering." Because of the ambiguity, the Director doubted that she could establish that attendance at a political gathering by a judicial candidate was prohibited. *Id.*, ¶ 17, Ex. D. With respect to seeking political endorsements, the Director determined that Wersal is only prohibited from personally seeking endorsements, and that Wersal did not engage in this type of conduct. *Id.* As to the issue of announcing views on disputed legal or political issues, the Director stated:

> The current prohibition contained in Minnesota Canon 5A3(d)(i) is identical to Canon 7B(1)(c) of the prior ABA Code of Judicial Conduct (1972 version). The parallel provision of current ABA Model Code of Judicial Conduct (1990 version) does not contain a blanket prohibition against announcing views on disputed issues. Instead, the current ABA provision prohibits "statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court." The ABA adopted the 1990 version out of concern over the constitutionality of the 1972 version. Although adoption of the 1990 version was proposed to the Minnesota Supreme Court in June 1994 by the Minnesota Advisory Committee to review the American Bar Association Model Code of Judicial Conduct, it was not adopted by the Minnesota Supreme Court.
>
> \*    \*    \*    \*    \*    \*
>
> The Director's Office had doubts about the constitutionality of the current Minnesota Canon and its application to respondent's statements. In addition the Director doubts she would be able to prove by clear and convincing evidence that the statements in respondent's campaign materials constitute an announcement of his views on the issues of crime, welfare or abortion, let alone that they appear to commit respondent with respect to any of these three issues. For

> these reasons the Director has determined that discipline is not warranted.

Ex. D. to Wersal Aff.

Even though the complaint was dismissed, Wersal asserts that he withdrew his candidacy for Associate Justice as a result of the Complaint, fearing that further Complaints would be filed against him, jeopardizing his ability to practice law. *Id.* ¶ 20.

In January 1997, Wersal announced his intention to once again run for the office of Associate Justice of the Minnesota Supreme Court in the primary and general election of 1998. *Id.* ¶ 21. However, as a result of amendments to Canon 5 of the Judicial Codes that took effect in 1997, Plaintiffs allege that Wersal and others acting on his behalf were no longer able to attend and speak at gatherings of political organizations, were not able to identify Wersal as a member of the Republican Party, were not allowed to discuss Wersal's views on many disputed legal and political issues, and were prevented from soliciting contributions from political parties and from seeking, accepting or using a political party endorsement. *Id.* ¶¶ 27 – 29.

Plaintiffs allege that as a result of Canon 5's prohibitions, Wersal was not endorsed by the Republican Party or any of its Affiliated Associations and because he was not allowed to attend or speak at its political gatherings, the Third Party Plaintiffs were not given the opportunity to hear of Wersal's views on disputed issues. The Third Party Plaintiffs allege that the prohibitions contained in Canon 5, as applied to them, adversely affected its members because they were denied the necessary information about Wersal to allow them to make an informed decision at the voting booth.

In February 1998, Wersal sought an advisory opinion from the Office of Professional Responsibility as to whether the Office intended to enforce the prohibitions against judicial candidates: 1) speaking on

their own behalf to political party organization gatherings; 2) seeking, accepting or using endorsements from a political party organization; and 3) announcing his or her views on disputed legal issues. *Id.*, ¶ 33. The Office of Professional Responsibility responded in the affirmative to the first two questions, but declined to answer the third on the basis that Wersal had failed to specify what statements he would make that may or may not be a view on a disputed legal or political issue. The Director reiterated his concern, however, that the announce clause was not constitutional as written. Ex. W to Wersal Aff.

In their Complaint, Plaintiffs have asserted five separate claims. In Count One, Plaintiffs allege that Canons 5 A(1) and B(1), which prohibits judicial candidates, their families and others acting on the candidate's behalf, from attending and speaking at political gatherings, infringes upon their rights to freedom of speech and association as guaranteed them under the United States and Minnesota Constitutions. Complaint ¶ 35. Plaintiffs also allege that this prohibition violates the equal protection clauses of the United States and Minnesota Constitutions, as the Judicial Codes' definition of political organization affects political organizations such as the Republican Party, but no "special interest" organizations such as political action committees, the Minnesota Trial Lawyers Association or MADD. *Id.* ¶ 40. In Count II, Plaintiffs allege that the ban on judicial candidates from announcing their views on disputed legal or political issues contained in Canon 5 A(3), violates the individual plaintiffs' freedom of speech. *Id.* ¶¶ 42 and 61. Counts III and IV assert claims involving the violation of the rights of freedom of speech, freedom of association and equal protection, as a result of the Judicial Codes ban on judicial candidates identifying their political party contained in Canon 5 A(1), and the ban on seeking, accepting or using political party endorsements contained in Canon 5 A(1) and B(2). *Id.* ¶¶ 62 and 79. Finally, in Count V, Plaintiffs assert Canon 5 B(2)'s ban on judicial candidates personally soliciting campaign contributions is a violation of the right to freedom of speech. *Id.* ¶ 102.

Plaintiffs moved for a temporary. restraining order to enjoin the enforcement of Canon 5 prior to the precinct caucuses on March 3, 1998. The motion was denied. On November 2, 1998, the Eighth Circuit affirmed this Court's decision to deny the TRO, but expressed no opinion on the merits of Plaintiffs' claims. *Republican Party of Minnesota v. Kelly,* 163 F.3d 602, 1998 WL 764782 (8th Cir.1998).

Currently before the Court are cross motions for summary judgment.

*Standards for Summary Judgment*

Summary judgment is appropriate if there is no genuine issue of material fact and a party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Unigroup, Inc. v. O'Rourke Storage & Transfer Co.,* 980 F.2d 1217, 1219–20 (8th Cir.1992).

In order to prevail against the claims asserted in the Complaint, the Defendants must establish that the relevant sections of Canon 5 of the Judicial Codes are narrowly tailored to serve a compelling state interest. *Stretton v. Disciplinary Board of the Supreme Court of Pennsylvania,* 944 F.2d 137, 141–142 (3rd Cir.1991).[2]

*Analysis*

I.   Bans on Political Activity

A.   Compelling State Interest

■   At issue in this case is the conflict of two principles, the roots of which "lie deep in our constitutional heritage." *Buckley v. Illinois Judicial Inquiry*

---

2.   The Defendants assert that other standards may be applicable to the constitutional challenges presented by Plaintiffs in their Complaint. For purposes of the current motions before the Court, however, the Defendants will not dispute the applicability of the strict scrutiny analysis.

*Board,* 997 F.2d 224, 227 (7th Cir.1993). One is the freedom of candidates to express their views on all matters of interest to the electorate. *Id.* The other, is that "[j]udges should decide cases in accordance with the law rather than with any express or implied commitments that they may have made to their campaign supporters or others." *Id.*

The Defendants herein assert that those provisions of Canon 5 that prohibit a candidate from: 1) attending and/or speaking at gatherings of political parties, 2) identifying himself/herself as a member of a political party, and 3) seeking, accepting or using an endorsement from a political party were enacted because of the long recognized principle that politics can interfere with the actual and apparent integrity and independence of the judiciary. Defendants further assert that the bans on political activity by a judicial candidate are narrowly tailored to serve several compelling state interests: preventing bias or the appearance of bias in favor of the judge's political party or against members of a rival party; preventing bias or the appearance of bias in judge's decisions of particular cases that involve party positions; promoting judicial independence by helping to ensure judges owe their jobs to no one but the general electorate. Defendants assert Canon 5 serves to accomplish these goals by regulating the conduct of the judicial candidate, and those under his or her control while preserving the freedom of the general electorate, including political parties, to seek information necessary to make an informed choice at the voting booth.

■ Plaintiffs argue that by choosing to elect judges, the state of Minnesota "does not have an independent judiciary." Plaintiff Wersal's Memorandum in Support of Motion for Summary Judgment, p. 2. Plaintiffs further argue that there are no facts to support the Defendants' assertion that political influences have a negative effect on the independence of the judiciary. The Court rejects both of these assertions.

Plaintiffs have failed to put forth any authority for its assertion that by choosing to elect judges, the state has no interest in restricting the influences of partisan politics on judicial candidates. As aptly noted by the Third Circuit Court of Appeals: "The fact that a state chooses to select its judges by popular election, while perhaps a decision of questionable wisdom, does not signify the abandonment of the ideal of an impartial judiciary carrying out its duties fairly and thoroughly." *Stretton,* 944 F.2d at 142. Furthermore, there is sufficient evidence to support the finding that the influences of the political parties have a negative effect on the independence of the judiciary.

Although the framers of Minnesota's constitution adopted the process of judicial selection through popular election, the historical record does not suggest that in doing so, the state disregarded the notion of judicial independence in favor of the political process. In fact, in its summary of the history of Minnesota's system for selecting judges, the Minnesota Supreme Court wrote that the system eventually adopted by the framers of Minnesota's Constitution recognized the necessity of maintaining an independent judiciary. *Peterson v. R.H. Stafford,* 490 N.W.2d 418, 420 (Minn.1992) *cert. denied,* 507 U.S. 1033, 113 S.Ct. 1852, 123 L.Ed.2d 475 (1993).

> The methods by which the federal system and other states initially select and then elect or retain judges are varied, yet the explicit or implicit goal of the constitutional provisions and enabling legislation is the same: to create and maintain an independent judiciary as free from political, economic and social pressure as possible so judges can decide cases without those influences. That that goal guided the framers of the federal Constitution to grant life tenure to judges is evidenced by the writings of Alexander Hamilton which expressed concern that life tenure would provide judges sufficient security to allow them

to rule with their consciences and according to the Constitution, rather than to bow to political notions. While the framers of our state constitution have developed a system of selection and election quite different from that federal scheme, they too designed a plan to recognize the uniqueness and independence of the state judiciary.

*Id.* Initially, the framers attempted to distinguish judicial elections by providing judges with seven year terms so that judicial elections would not occur at the same time as elections for other elective office. *Id.* It wasn't until judicial terms were thereafter reduced to six years that "the difficulties associated with partisan [judicial] elections became more evident." *Id..*

One clear example of the influence of political parties upon judicial elections occurred when "at the election of 1898, judicial offices had been dragged into politics." 1 History of the Bench and Bar of Minnesota 66 (1904). Justice William Mitchell was first appointed to the Minnesota Supreme Court in 1881. At the succeeding election, he was nominated by the democratic and republican party. *Id.* "By the same non-partisan unanimity he was re-elected in 1886 and again in 1892." *Id.* During the election of 1898, however, Justice Mitchell was not nominated by the republican party "and at the election which followed, Minnesota lost its greatest judge." [3] *Id.*

To counter the conflicts that had arisen and the potential conflicts that could arise "between the demands of an election process and the judicial impartiality required to decide cases free from political maneuvering", legislation was passed providing for judicial elections to be nonpartisan in 1912. *Peterson* 490 N.W.2d at 422. After judicial elections became nonpartisan, however, the concern remained that political influence would nonetheless infiltrate the judicial election process. For example, in *Moon v. Halverson,* 206 Minn. 331, 288 N.W. 579 (1939), the court was asked to interpret the Minnesota statute [4] that provided that the office of chief justice and associate justice of the Supreme Court and all elective county offices would be nonpartisan. Specifically at issue in that case was whether an individual running for the office of the register of deeds could solicit political party support without violating § 294. Although judicial elections were not specifically at issue in *Moon,* Justice Loring nonetheless took the opportunity to submit a concurring opinion to voice his

**3.** That Justice Mitchell was a great jurist, respected throughout the country as well as in Minnesota, is illustrated by a letter written by a Harvard Law Professor to a friend in Minnesota. In the letter, Professor Thayer wrote:

I am astonished that there is doubt of the re-election of Judge Mitchell to your supreme court. I wish the people of Minnesota knew the estimate that is put upon him in other parts of the country, and there could be no doubt about it then ... I have long recognized Judge Mitchell as one of the best judges in this country, and have come to know also the opinion held of him by lawyers competent to pass on an opinion on such a question ... Pray do not allow your state to lose the services of such a man. To keep him on the bench is a service not merely to Minnesota, but to the whole country and to the law. Your state it is that is now on trial before the country. The question is: Can Minnesota appreciate

such a man? Is it worthy to have him? I am not going to believe that a state which can command the services of one of the few judges in the country that stand out among their fellows as pre-eminent, that give it distinction, will refuse to accept these services. You lawyers of Minnesota must not let party politics work any such result.
1 History of the Bench and Bar of Minnesota, 71.

Justice Mitchell is also the namesake of the William Mitchell College of Law, whose distinguished alumni include The Honorable Warren E. Berger '31, Chief Justice of the United States Supreme Court, 1969–1986, The Honorable Douglas K. Amdahl '51, Chief Justice, Minnesota Supreme Court, 1980–1988, The Honorable Rosalie E. Wahl '67, Associate Justice, Minnesota Supreme Court, 1977–1994, and the Honorable Paul A. Magnuson '63, Chief Judge, United States District Court, District of Minnesota.

**4.** 1 Mason Minn.St.1927 § 294.

concern regarding political party endorsements of judicial candidates.

When candidates for such offices were placed on a non-partisan ballot it was, it seems to me, the purpose of the legislature to lift the judgeships above sordid political influence and to free the candidates from obligation to a political party so that if elected they might render judicial instead of partisan political decisions on matters where party programs, party interests or even prominent party leaders might be involved. *The abuse and accusations of party treason which have been heaped upon some judges in the recent past because of decisions thought to be contrary to the interests of an indorsing [sic] party ought to be evidence enough of the impropriety of party indorsements [sic] and of their purpose to induce partisan political rather than impartial judicial decisions.* Judges are or should be elected to interpret the law as they find it without fear or favor. It poisons the very fount of democracy if they do not do so. Nothing so shakes the confidence of the people in their courts and arouses contempt for their government, as politically minded judges. There can be no propriety in any influence which tends, consciously or otherwise, to prevent impartiality or which tends to create a feeling of party obligation. If the statutes or the constitution, as interpreted by courts, do not suit the people the proper remedy lies in the legislature or by amendment to the constitution, not in judicial misinterpretation.

*Id.,* 288 N.W.2d at 581–582 (emphasis added). The inherent tension in the judicial election process was again recognized in the 1972 Constitutional Study Commission,

Judicial Branch Committee Report, which recognized that "qualified lawyers may not seek judicial appointment for fear they will give up their practice only to be defeated by a politician with a popular name" and that the "public finds it distasteful for judges to become embroiled in politics." *Peterson,* 490 N.W.2d at 422–423.[5]

In determining whether the state has a compelling interest in maintaining the actual and apparent independence of the judiciary, the Court must keep in mind the functions of the judiciary, compared to those of the executive and legislative systems.

The functioning of the judicial system differs markedly from those of the executive and legislative. In those areas, the public has the right to know the details of the programs that candidates propose to enact into law and administer. Pledges to follow certain paths are not only expected, but are desirable so that voters may make a choice between proposed agendas that affect the public. By contrast, the judicial system is based on the concept of individualized decisions on challenged conduct and interpretations of law enacted by the other branches of government.

*Stretton,* 944 F.2d at 142. *See also, Buckley,* 997 F.2d at 228 ("judges remain different from legislators and executive officials, even when all are elected, in ways that bear on the strength of the state's interest in restricting their freedom of speech.") It is these very differences that have been the basis for finding that the state has a compelling interest in imposing restrictions in judicial campaigns. *See e.g., Morial v. Judiciary Comm'n of Louisiana,* 565 F.2d 295, 302 (5th Cir.1977) *cert. denied,*

---

**5.** This Court is also mindful of numerous examples in other states, in which judicial elections were influenced by partisan politics. *See e.g., Geary v. Renne,* 911 F.2d 280, 309–314 (9th Cir.1990) (J. Alarcon dissenting) *vacated and remanded Renne v. Geary,* 501 U.S. 312, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991) (discussing the effect that California's political parties had on the integrity and independence of the judiciary and local office holders); Penny J. White, *Judicial Independence: Second Steps,* 38 JUDGES' JOURNAL No. 3, ¶.5–8 (Summer 1999) (discussing the effect that single issue, negative political maneuvering had on authors' retention election to the Tennessee Supreme Court, as well as other examples).

435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978); *Ackerson v. Kentucky Judicial Retirement and Removal Comm.,* 776 F.Supp. 309 (W.D.Ky.1991). "An evenhanded, unbiased and impartial judiciary is one of the pillars upon which our system of government rests. To the degree appropriate, the conduct of judicial elections . . . may be regulated so as to meet that interest, even if freedom of speech is thereby constrained." *Ackerson,* 776 F.Supp. at 313. *See also, Haffey v. Taft,* 803 F.Supp. 121, 125 (S.D.Ohio 1992) (in upholding state statute that prohibited the identification of judicial candidate's political affiliation on general ballot, court recognized that the state has a significant interest in keeping politics out of judicial elections.)

The United States Supreme Court has recognized, in the context of federal and state employees, that partisan political activities must be limited in order to ensure meritorious performance. *U.S. Civil Service Comm'n v. Nat'l Ass'n of Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) (upholding Hatch Act restrictions on federal employees); *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (upholding state statute imposing restrictions on state employees in political party activities).

> Such decision on our part would no more than confirm the judgment of history, a judgment made by this country over the last century that it is in the best interest of the country, indeed essential, that federal service should depend upon meritorious performance rather than political service, and that the political influence of federal employees on others and on the electoral process should be limited.

*Letter Carriers,* 413 U.S. at 557, 93 S.Ct. 2880. The Court held that not only was it important that the Government and its employees in fact avoid practicing political justice, it was also "critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent." *Letter Carriers,* at 565, 93 S.Ct. 2880.

Applying this rationale to the judicial candidate, the court in *Morial* noted "[t]he government has at least as great an interest in assuring the impartiality of judicial administration of the laws as in assuring the impartiality of bureaucratic administration of the laws." *Id.,* 565 F.2d at 302. The Court in *Letter Carriers* and *Broadrick,* as well as the court in *Morial,* recognized the essential role political parties play in the electoral process, but at the same time recognized that political influence, or the appearance thereof, is simply not compatible with the administration and interpretation of the law.

In support of their position that the state has no compelling interest in preserving an independent judiciary by restricting political activities of the judicial candidate and his/her supporters, Plaintiffs rely on a line of cases that addressed the constitutionality of a California Election Code and a California constitutional provision that banned political party endorsements at primaries and banned political parties from endorsing, supporting or opposing a candidate for nonpartisan office. *Eu v. San Francisco County Dem. Central Comm.,* 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989); *Renne v. Geary,* 501 U.S. 312, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991); *California Democratic Party v. Lungren,* 919 F.Supp. 1397 (N.D.Cal.1996).

In *Eu,* the United States Supreme Court held that a ban on political parties' right to endorse candidates at primaries burdened their rights to free speech and free association, and that the ban could survive constitutional challenge only if such ban served a compelling state interest. The state had argued that the ban served to stabilize government and to protect voters from confusion and undue influence. The Court found, however, that the state had not shown how the ban served these asserted interests. 489 U.S. at 229, 109 S.Ct. 1013. Similarly, in *Lungren,* the district court struck down a state constitu-

tional prohibition of party endorsements of candidates for non-partisan office. In doing so, the court rejected the state's assertion that it had a compelling state interest in preventing voters from being unduly influenced by political party endorsements. *Lungren,* 919 F.Supp. at 1402 (citation omitted).

*Eu* and its progeny are not controlling here, however, as the bans at issue in this case focus on the conduct of the judicial candidate, while the *Eu* line of cases address bans that restricted the conduct and speech of political parties and its members. This distinction is crucial and was pointed out by the court in *Lungren.*

> The court will assume arguendo that California has a compelling interest in preventing nonpartisan officeholders from engaging in conduct that tends to undermine the nonpartisan nature of their posts. Even so, Section 6(b) misses the mark. The evil sought to be combated is the unseemly partisanship of nonpartisan officers once they are in office, not the partisanship of political parties (which, of course, is the very nature of political parties). Section 6(b) purports to prevent officeholders from being "beholden" to political parties by imposing a ban on the parties' speech about candidates for office, rather than (as the Supreme Court approved in Letter Carriers) a ban on the partisan political conduct of the officeholders themselves. *This distinction is crucial.* The government has an interest in the manner in which its elected officials conduct themselves while in office. The government does not and cannot have a legitimate interest in silencing the speech of third parties about the qualifications and political views of candidates for those offices.

919 F.Supp. at 1402 (emphasis added). The court went on to note that "California can, of course, prohibit judges from engaging in partisan political activity once they are in office." *Id.* at 1405 (citing *Letter Carriers,* 413 U.S. at 564–65, 93 S.Ct.

2880.) Clearly, if judges are prohibited from engaging in political activity once in office, then judges that are seeking reelection are similarly prohibited from such activity. In stands to reason, then, that in order to prevent a lawyer candidate from gaining an unfair advantage during an election by garnering the support of a political party, lawyer candidates should also be prevented from engaging in political activity during the election.

The Third Party Plaintiffs argue that Canon 5 as applied to them, does, in fact, infringe on their rights of free speech, free association and of their right to receive information. Thus, *Eu* and its progeny are directly applicable to the issue of whether the state has a compelling interest sufficient to withstand scrutiny. In support of their argument, the Third Party Plaintiffs have submitted twenty examples of how their rights to freedom of speech, association and the right to receive information were infringed by Canon 5. For example, the Third Party Plaintiffs identify a number of its members that did not receive or transmit any information about Wersal or other judicial candidates at Republican Party conventions because of Canon 5. *See generally,* Response Memorandum of Republican Party, ¶.5–10. Because of these restrictions, the Third Party Plaintiffs argue that it was unable to endorse Wersal for the position of Associate Justice.

This argument is without merit. Nothing in Canon 5 prohibits political parties from endorsing judicial candidates, or from accessing information on a judicial candidate in order to allow them to make an informed choice at the voting booth. The fact that attendees at political gatherings prior to the elections in 1998 misunderstood Canon 5 and its proscriptions does not alter the reality that the Canons do not prevent political parties or its members from seeking information on judicial candidates. While such information is not available at party conventions from the candidate, there exists alternative means

to access information on judicial candidates. For example, candidates are not prohibited from communicating to the voters through the media, literature or on a door-to-door basis.

■ Finally, Plaintiffs argue that the state has produced no facts to support its assertions that the state has a compelling interest in maintaining an independent judiciary and that restricting political activity by judicial candidates narrowly serves that interest, relying only on conclusory statements. A similar argument was rejected in *Kirchgessner v. Wilentz*, 884 F.Supp. 901 (D.N.J.1995). In *Kirchgessner*, the district court held that a New Jersey Supreme Court policy that prohibited probation officers from becoming affiliated with law enforcement organizations did not violate the probation officers' rights of freedom of association. In so finding, the court held that probation officers, as employees of the judicial branch of government, must be perceived as free from outside influences, and that membership in law enforcement associations would harm that perception. 884 F.Supp. at 913. Plaintiffs in that case had argued that there was no evidentiary support for the court's finding. The court responded to this concern by noting:

> [T]he only way you could have empirical data is when partiality is developed, when conflict is developed and at that point it is too late, the system is brought down under its own weight ... there can[not] be any basis, other than for theory unless the system went so awry, unless the system was so rife with corruption or partiality that [the evidence] would [then] be[come] objective ...
> What makes the judiciary viable in any governmental setting is th[e] distance that impartiality and the appearance of impartiality ... [create and which] people can rely on.

*Id.*

This Court rejects this argument as well. As recognized by the Minnesota Supreme Court: "A judge has a position of power and prestige in a democratic society espousing justice for all persons under law ... Our legal system can function only so long as the public, having confidence in the integrity of its judges, accepts and abides by judicial decisions." *Complaint Concerning Winton*, 350 N.W.2d 337, 340 (Minn.1984). It is also well recognized that political activity by a judge or judicial candidate creates a potential for conflicts of interests. *See, e.g., Peterson*, 490 N.W.2d at 422. Accordingly, Defendants need not show that individual cases were decided wrongly due to the corruption of the judicial system caused by those activities prohibited by Canon 5.

The Court finds that Defendants have established that the State of Minnesota has a compelling interest in maintaining the actual and apparent integrity and independence of its judiciary and that the bans on political activity may be upheld if they are narrowly tailored to serve that interest.

**B.  Narrowly Tailored**

■ Plaintiffs argue that the bans on political activity are not narrowly tailored to serve the state's interest in protecting the independence of the judiciary. Plaintiffs assert that the bans resulted in the Third Party Plaintiffs not being able to receive or transmit any political communications relating to Wersal, such as his name, law school or employer. As noted above, however, this argument is without merit. Alternative means exist through which voters may obtain information concerning judicial candidates. Because such information is available to the Third Party Plaintiffs through such means, the Court finds the Canons are narrowly tailored to serve the state's compelling interests.

**C.  Vague**

■ The Third Party Plaintiffs further argue that Canon 5 does, in fact, infringe upon their rights under the First Amendment because the Canon is vague. Canon

5(A)(3)(c) provides that a candidate for judicial office "shall not authorize or knowingly permit any other person to do for the candidate what the candidate is prohibited from doing under the Sections of this Canon." The Third Party Plaintiffs assert that this provision is constitutionally vague, as it can be interpreted as prohibiting any supporter of a candidate from engaging in the proscribed political activities, including political parties and their members. They argue that any supporter who attends a political gathering on the judicial candidate's behalf, or otherwise engages in conduct on behalf of the judicial candidate in such a way as to permit an inference that the candidate knew of such activities, technically violates the Judicial Codes—leaving open the possibility that an ethical complaint may be filed.

The Court finds this argument to be without merit as well. To succeed on the argument that the Canon is unconstitutionally vague, Plaintiffs must show that "men of common intelligence must necessarily guess at its meaning." *Broadrick v. Oklahoma*, 413 U.S. at 607, 93 S.Ct. 2908. The words "authorize" and "permit" are commonly used words that both involve the concept of consent.[6] "Knowingly permit" is a commonly used phrase in Minnesota statutes, *See,* Levinger Aff., Ex. 8 and 9, and it has been given a narrow construction by the Minnesota Supreme Court. *See, Johnson v. Holzemer,* 263 Minn. 227, 116 N.W.2d 673 (1962). In *Holzemer,* the court held that the phrase "knowingly permit" as used in a criminal statute that declared "every person ... knowingly permitting any such minor to violate [a firearm's possession law] shall be guilty of a misdemeanor" applied only to those persons having "some right to authoritative control" over such minor, such as a parent, a guardian, a teacher or law enforcement officer. *Id.* 263 Minn. at 237, 116 N.W.2d at 679. Thus, the statute only applied to persons who had the power to give or

enforce commands or directions to the minor. *Id.* Given this interpretation by the Minnesota Supreme Court, the terms "authorize" and "knowingly permit" as used in Canon 5(A)(3)(c) applies only to those persons over which the judicial candidate has some right or authoritative control. This interpretation necessarily implies that only if a close connection exists between the judicial candidate and the supporter, will the provisions in Canon 5 A(3)(c) come into play.

### D. Equal Protection

■ The Third Party Plaintiffs also argue that the partisan political prohibitions provided in Canon 5 violate their right to equal protection as such prohibitions are applicable to political parties only, and not special interest groups. Plaintiffs assert that the asserted compelling state interest of maintaining the independence of the judiciary would also be served by imposing similar prohibitions on special interest groups such as the Minnesota Women Lawyers, or Minnesota Citizens Concerned for Life.

The Fourteenth Amendment to the United States Constitution provides that "No State shall ... deny to any person within its jurisdiction the equal protection of the law." To survive an equal protection challenge, Defendants must demonstrate that the state has a compelling state interest justifying the classification, and that such classification is narrowly tailored to serve such interest. At the same time, however, the Court must keep in mind that a state need not exercise the full extent of its power to prevent an evil in order to comply with the equal protection clause. *Morial,* 565 F.2d at 302 n. 6 (relying on *Buckley v. Valeo,* 424 U.S. 1, 29, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)). *See also, Broadrick,* 413 U.S. at 607, n. 5, 93 S.Ct. 2908 (recognizing that "the legislature

---

6. "Permit" is defined as: 1. To consent to: Allow. 2. To give permission to or for: authorize. 3. To afford opportunity to. Webster's II

New College Dictionary (1995). "Authorize" is defined as: 1. To give authority or power to. 2. To approve or permit: sanction. *Id.*

must have some leeway in determining which of its employment positions requires restrictions on partisan political activities and which may be left unregulated ... And a state can hardly be faulted for attempting to limit the positions upon which such restrictions are placed.")

In this case, the Minnesota Supreme Court "chose to limit what it perceived to be the most problematic type of political conduct by judicial candidates—that linking those candidates with partisan political parties." Memorandum of Defendant Flinn in Support of Motion for Summary Judgment, p. 18. Partisan political activity was determined to be the most problematic given the breadth of the parties' platforms and agendas, and of the greater membership and affiliations than special interest groups. Furthermore, Defendants assert that special interest groups may exist that would be an appropriate contact for a judicial candidate, such as a group created to support improvements in the administration or organization of the courts.

Other courts have upheld statutes that treat partisan political activity different from non-partisan political activity. *See e.g., Letter Carriers,* 413 U.S. at 562, 93 S.Ct. 2880 (upholding Hatch Act, which restricted political activities of federal employees, but not non-partisan political activity); *Bauers v. Cornett,* 865 F.2d 1517, 1525 (8th Cir.1989).

Because the Judicial Codes' restrictions on partisan political activity clearly relate to the state's compelling interests, there is no violation of the equal protection clause. In so finding, the Court has determined not to fault the Minnesota Supreme Court

for not exercising the full extent of its power to eradicate all possible sources of improper influence towards the judiciary.[7]

II. Ban on Judicial Candidate Personally Soliciting Contributions

■ Canon 5 B(2) of the Judicial Codes prohibits a judicial candidate from personally soliciting campaign contributions. The Canon also provides that a judicial candidate may establish a committee to solicit and accept funds on the candidate's behalf, but the committee is prohibited from disclosing the identity of contributors.

Defendants assert that the state has a compelling interest in avoiding "unfair pressure on the solicited, potential pressures on the judge to later show favoritism, and the appearance of corruption." Defendant Flinn Memorandum in Support of Motion for Summary Judgment, p. 21. Defendants further assert that the Canon is narrowly tailored to serve this purpose, as it allows judicial candidates to obtain financial support for his/her campaign through a committee while safeguarding its compelling interest by preventing the candidate from learning of the contributions' source.

A similar ban was upheld by the Third Circuit in *Stretton,* 944 F.2d at 146. *See also, Suster v. Marshall,* 951 F.Supp. 693, 704 (N.D.Ohio 1996) *aff'd,* 149 F.3d 523 (6th Cir.1998) (Ohio Judicial Code prohibiting judicial candidates from personally soliciting campaign funds appeared to be constitutional).

Plaintiff Wersal does not appear to contest that the state has a compelling interest in preventing the undue influence of

---

7. Plaintiff Wersal argues that the state cannot discriminate against political parties as opposed to special interest groups on the basis that the U.S. Supreme Court has consistently held that the government cannot prohibit the fundamental rights of free speech or free association based on the content of the speech or the type of group engaging in the speech. *Wersal Reply Memorandum in Support of Motion for Summary Judgment,* p. 7. Wersal

then cites to a number of Supreme Court cases, such as *R.A.V. v. City of St. Paul,* 505 U.S. 377, 387, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). Plaintiff's reliance *R.A.V.* is misplaced, however. The Court in *R.A.V.* specifically noted that "presumptive invalidity does not mean invariable invalidity, leaving room for such exceptions ... with respect to certain speech *by government employees"* citing to *Broadrick, supra,* and *Letter Carriers, supra.*

money on judicial candidates. Wersal argues, however, that the ban on personal solicitation is unconstitutional as it is not narrowly tailored to serve such interest because other Code provisions protect the interest. Wersal argues that any concern with the corrupt influence of money on judicial candidates is fully alleviated by the Code provision that prevents a judicial candidate from knowing the identity of contributors. In support, Wersal cites to *Stretton* for the proposition that it is the candidate's knowledge of the contribution that gives the appearance of undue influence. The Court does not agree. The court in *Stretton* stressed that a judicial candidate's personal solicitation of campaign contributions "lends itself to the appearance of coercion or expectation of impermissible favoritism." *Stretton,* 944 F.2d at 146. Thus, although in *Stretton* the court acknowledged that the codes at issue did not prohibit the candidate from learning of contributors' identities, it held that "we cannot say that the state may not draw a line at the point where the coercive effect, or its appearance, is at its most intense, personal solicitation by the candidate." *Id.*

◼ The Third Party Plaintiffs argue that the personal solicitation ban on judicial candidates violates their free speech and associational rights, relying on *Buckley v. Valeo, supra* and *Suster v. Marshall, supra.* Neither case, however, supports their argument that a ban on personal solicitation by judicial candidates violates first amendment rights. *Buckley* addressed limits on political contributions, and *Suster* addressed contribution limits and a ban on personal solicitation, expressly stating the ban on personal solicitation "appears constitutional."

The Court finds that the state has a compelling interest in preventing the un-

due influence, and the appearance of undue influence, that may result in a judicial candidate personally soliciting campaign funds. The Court further finds that the Codes are narrowly tailored to serve that interest.[8]

### III. Announce Clause

◼ In Count 2 of the Complaint, Plaintiffs argue that the announce clause violates their rights to free speech under the U.S. and Minnesota Constitutions. Prior to addressing the merits of Plaintiffs' claim, the Office of Professional Responsibility and the Lawyers Board argue that there is no case or controversy before the Court with respect to these Defendants. To establish a case or controversy, a plaintiff must demonstrate that there exists a danger of sustaining an injury as a result of a law's operation or enforcement. *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). It is sufficient if the injury is impending. *Id.* The Lawyers Board and the Office of Professional Responsibility argue that they pose no injury or threat of injury with respect to the announce clause, as they have not enforced the clause and do not intend to do so unless the Court finds the clause constitutional. However, nonenforcement will not be an impediment to finding justiciability where the record does not show that the statute or rule at issue has been commonly and notoriously violated in the past. *See, San Francisco County Democratic Central Committee v. Eu,* 826 F.2d 814, 822 (9th Cir.1987) *aff'd* 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989) (citing *Babbitt,* 442 U.S. at 302–303, 99 S.Ct. 2301 and *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968)). In this case, there is no showing that the announce clause has been commonly and notoriously violated in the past. Thus, non-

---

**8.** Wersal argues that he only seeks to personally solicit large groups, and that such a change to the Canons was recommended by the Minnesota State Bar Association. Wersal does not attempt to define "large group" nor does he explain why personally soliciting a large group is distinguishable from other groups. The Court finds, however, that there is no basis for such a distinction.

enforcement will not impede a finding of justiciability. Accordingly, the Court finds that it properly has jurisdiction to decide Count II as against all Defendants.

■ Canon 5 A(3)(d)(i) prohibits judicial candidates from "announcing their views on disputed legal or political issues." The Judicial Board [9] asserts that the announce clause serves the compelling state interest of maintaining the actual and apparent impartiality and independence of the judiciary by preventing a candidate from committing himself/herself as to certain issues prior to being faced with a particular case or controversy.

A number of courts in other jurisdictions have addressed the same or substantially similar issue. In each, the court has found that the state has a compelling interest in limiting the First Amendment rights of judicial candidates in order to maintain the actual and apparent impartiality and independence of the judiciary. *See, Buckley,* 997 F.2d at 227–228; *Stretton,* 944 F.2d at 142; *Ackerson,* 776 F.Supp. at 312; *American Civil Liberties Union of Florida, Inc. v. Florida Bar,* 744 F.Supp. 1094, 1097 (N.D.Fla.1990); *Berger v. The Supreme Court of Ohio,* 598 F.Supp. 69, 74 (S.D.Ohio 1984) *aff'd* 861 F.2d 719, 1988 WL 114792 (6th Cir.1988).

> The public has a right to expect that a court will make an assessment of the facts based on the evidence submitted in each case, and that the law will be applied regardless of the personal views of the judge. Taking a position in advance of litigation would inhibit the judge's ability to consider the matter impartially. Even if he or she should reach the correct result in a given case, the campaign announcement would leave the impression that, in fact, if not in actuality, the case was prejudged rather than adjudicated through a proper application

of the law to facts impartially determined.

*Stretton,* at 144.

This Court does not hesitate in finding that the state has a compelling interest, necessitating the restriction of judicial candidates' speech to maintain the integrity of the judiciary. The critical issue with respect to the announce clause is whether it is narrowly tailored to serve that interest. In *Stretton, supra,* the Third Circuit upheld similar language against a constitutional attack by construing the canon narrowly. In doing so, the court noted that the Chief Counsel of the Disciplinary Board, the General Counsel of the Judicial Inquiry and Review Board had interpreted the canon "as prohibiting a candidate only from announcing a position on an issue that may come before the court for resolution." *Id.,* 944 F.2d at 142. In construing the canon narrowly, the court also recognized that when a statute or regulation is challenged, the court should employ an interpretation that will avoid constitutional difficulties. *Id.* at 143 (citations omitted). The court then found that the State Supreme Court had, in the past, interpreted its rules in the light necessary to obviate the constitutional objections. *Id.*

By contrast, the court in *Buckley, supra,* held the identical language violated the First Amendment, because the canon reached far beyond speech that could reasonably be interpreted as committing a candidate in a way which would compromise impartiality if such candidate succeeded in the election. The defendants in *Buckley* urged the court to adopt a narrow construction of the canon, by asserting the canon allows a candidate a right to reply, and that the word "announce" should be read to encompass only statements in which a judicial candidate tells the electorate how he/she will vote on a particular case. The court rejected the invitation to construe the canon in the narrow manner

---

9. The Lawyers Board and the Office of Professional Responsibility take no stand on the constitutionality of the announce clause.

suggested by the defendants and the district court. *Id.* at 230. The court then went on to distinguish its determination from that in *Stretton.*

> The [Stretton] court did not have the benefit of the insight into the scope of such a rule as is provided by a ruling such as that of the Illinois Courts Commission that condemned so innocuous a statement as a candidate's report of his past record ruling on a particular type of case (Justice Buckley's comment on rape convictions.) Nor did it have to confront the complexities introduced by a concession that a candidate has a broad right of reply or that the word "announce" should be read to mean to foretell one's vote.

*Buckley,* at 230.

The Judicial Board asserts that the announce clause can and must be interpreted narrowly to preserve its constitutionality, consistent with federal and state law. The Judicial Board further argues that in those cases that have held similar announce clauses unconstitutional, the courts have done so on the "assumption that the prohibition against announcing views on disputed legal or political issues leaves a judicial candidate with nothing more to discuss and put before the voters other than 'name, rank, and serial number.'" Defendant Flinn Memorandum in Support of Motion for Summary Judgment, p. 24. However, the announce rule does not prohibit judicial candidates from discussing or stating their views as to matters relating to judicial organization and administration, or to other issues involving the character of candidates, their background and experience. *Bundlie v. Christensen,* 276 N.W.2d 69, 72 (Minn.1979). Thus, contrary to the finding of the court in *Buckley,* the Judicial Codes do not prevent candidates from discussing more than their name, rank and serial number.

Plaintiffs ask the Court to follow those cases that have found similar announce clauses unconstitutional. Plaintiffs further assert that the announce clause is modeled after an earlier version of the American Bar Association ("ABA") Model Canons, but that the ABA recently amended their Model Canons and that the current version provides that a judicial candidate shall not "make statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court ..." ABA Model Code of Judicial Conduct, Canon 5 A(3)(d)(ii). Plaintiffs would ask this Court to find that the fact that the ABA was compelled to change the language of the announce clause is evidence that the announce clause in effect in Minnesota is unconstitutional.

The Court acknowledges that in ruling on Plaintiffs' motions for a preliminary injunction, it initially ruled that Plaintiffs had shown a likelihood of success on the merits of its claim that the announce clause is unconstitutional as written. However, upon closer examination of the applicable case law, the Court is convinced that the announce clause is constitutional when narrowly construed.

When determining a facial challenge to a statute, the Court must uphold it if the statute's language is readily susceptible to a narrowing construction that would make it constitutional. *Virginia v. American Booksellers Ass'n,* 484 U.S. 383, 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988). "The elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Stretton,* at 144 (quoting *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988)). The Court further notes that the Minnesota Supreme Court "[w]hen possible, ... narrowly construes a law subject to a facial overbreadth attack so as to limit its scope to conduct that falls outside first amendment protection while clearly prohibiting its application to constitutionally protected expression." *In Matter of Welfare of R.A.V.,* 464 N.W.2d 507, 509 (Minn.1991), rev'd on other grounds, *R.A.V. v. City of*

*St. Paul,* 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).

Taking these practices into account, this Court finds that the Minnesota Supreme Court would interpret the announce clause narrowly, consistent with the construction urged upon the Court by the Judicial Board. This Court also notes that the announce clause, in its current form, was adopted by the Minnesota Supreme Court in 1974. Since that time, there have been many contested elections for judicial seats during which there was robust public discussion as to the candidate's qualification.[10] Thus, contrary to Plaintiffs' arguments, there is no evidence that the announce clause has had a chilling effect on the First Amendment rights of judicial candidates in the past.

In conclusion, by interpreting the announce clause as only prohibiting discussion of a judicial candidate's predisposition to issues likely to come before the court, the announce clause serves the state's compelling interest in maintaining the actual and apparent integrity and independence of its judiciary, while not unnecessarily curtailing protected speech.

IT IS HEREBY ORDERED THAT:

1. The motions of Defendants Judicial Board and the Lawyers Board and the Office of Professional Responsibility for Summary Judgment [Docket Nos. 96 and 99] are GRANTED in their entirety. Plaintiffs' Complaint is hereby DISMISSED with prejudice.

2. The Plaintiffs' Motion for Summary Judgment [Docket No. 48] is DENIED in its entirety.

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

10. A good example of such an election occurred in 1978, when Associate Justice Rosalie Wahl, the first woman to sit on the Minnesota Supreme Court, was challenged for the seat of Associate Justice by former Attorney General Robert Mattson Sr., Olmstead County District Court Judge Dan Foley and Ramsey County District Judge Jerome Plunkett.